# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

SALVADOR GARCIA,

                    Petitioner,

   v.

RANDY GROUNDS, Warden

                    Respondent.

_____/

1:10-cv-00140-DLB (HC)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT, AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

[Doc. 20]

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.  Local Rule 305(b).

## BACKGROUND

Following a jury trial in the Kern County Superior Court, Petitioner was convicted of penetration by a foreign object, assault with intent to commit penetration by a foreign object, sexual battery, spousal battery, assault with a deadly weapon, and criminal threats.  Several related enhancements were also found true.   Petitioner was sentenced to a three-year determinate term and an indeterminate term of 15 years to life.

On May 7, 2007, Petitioner filed a petition for writ of habeas corpus with the Kern County Superior Court.  The petition was denied in a reasoned decision on July 9, 2007.

---

[1] Respondent submits that Randy Grounds is the current acting Warden of the Correctional Training Facility, where Petitioner is housed.  Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Warden Grounds is substituted in place of former Warden Noll.

Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeal, Fifth Appellate District.  On June 6, 2008, the Court of Appeal struck the conviction of assault with intent to commit penetration by foreign object and directed the superior court to amend the abstract of judgment, but otherwise affirmed the judgment.

Petitioner filed a petition for review in the California Supreme Court.  On September 17, 2008, the California Supreme Court denied the petition.

Petitioner then filed another petition for writ of habeas corpus in the Kern County Superior Court on July 6, 2009.  The petition was denied in a reasoned decision on August 31, 2009.

On October 26, 2009, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fifth Appellate District.  On December 15, 2009, the Court of Appeal denied the petition.

On December 28, 2009, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  The petition was denied on February 22, 2010.

Petitioner filed the instant federal petition in this Court on November 25, 2009.  On April 15, 2010, the Court granted Petitioner's request to amend the petition.  The amended petition was filed on May 11, 2010.  Respondent filed an amended answer to the petition on June 7, 2010, and Petitioner filed a traverse on June 29, 2010.

STATEMENT OF FACTS

On June 30, 2006, at approximately 2:30 a.m., Maria Velasquez was awakened by Petitioner, her husband, in the apartment where they resided with their two children, Salvador Garcia, Jr. and Nayeli Garcia.[2]  (RT 363, 694.)  Petitioner told Velasquez he could hear a rattling noise coming from her vagina.  Petitioner touched her vagina over her clothing and told her she smelled.  (RT 646-648.)  Petitioner repeatedly told Velasquez that he could hear a rattling noise in her vagina that was making her masturbate.  When Velasquez denied the accusation Petitioner did not believe her.  (RT 452-453.)

---

[2] The two had been married for 25 years.

Petitioner pressed his hand on Velasquez's neck and asked what was inside her.  He continued to squeeze her neck and Velasquez attempted to push him away.  Petitioner hit her leg leaving a bruise.  (RT 455-458, 622.)  Petitioner ordered Velasquez to take off her clothing to check her and she complied.  Petitioner pushed her legs open and spread open her vagina with his fingers.  (RT 454, 459, 462-463, 648.)  Petitioner obtained a knife from under the bed and threatened to kill her if she did not tell him the truth.  Petitioner continued to look into her vagina insisting there was something inside.  (RT 465-466.)

Nayeli heard Petitioner loudly asking Velasquez to tell him something.  Nayeli went into their bedroom and saw her mother naked and Petitioner hide his hand.  Sandoval also went into the bedroom and saw his mother naked and Petitioner holding a knife, which he placed under the pillow.  (RT 730-731.)  Petitioner told Nayeli to get out of the room and Velasquez signaled for them to comply.  (RT 470-473, 657, 697-698.)  Nayeli complied out of fear of Petitioner.  (RT 697-698.)  Salvador indicated he needed to use the restroom and Petitioner allowed him to do so.  (RT 732.)  When he exited the restroom, his mother was covered and his father was in bed.  Petitioner told him to get out and Salvador complied.  (RT 732-733.)

After the children left, Petitioner was angry and yelling.  Velasquez told him to calm down because she was afraid the neighbors would hear and call the police.  (RT 661.)  Nayeli heard Petitioner continue to yell at her mother.  (RT 699-700.)

Velasquez needed to use the restroom and Petitioner went with her carrying a knife.  As Velasquez sat on the toilet, Petitioner stood at the doorway swinging his knife threatening to kill her.  (RT 470-473.)  Out of fear that Petitioner would kill her, she said she would tell the truth.  She then told him falsely that Alejandra Rosales gave her something to put in her vagina.  Petitioner said he was going to call Rosales and if she did not answer he would kill Velasquez.  Petitioner called Rosales and both he and Velasquez spoke to her.  Velasquez told Rosales she was scared because Petitioner threatened to kill her with a knife because he wanted to remove something she put in her vagina.  Both Petitioner and Velasquez asked Rosales if she had given her something to put in her vagina but Rosales did not answer.  (RT 475-476, 717.)

After Petitioner hung up the phone, he asked Velasquez why she had previously not told him the truth and said if she had he would not have hit her.  Petitioner then said they should both go to sleep but Velasquez was too frightened to sleep.  The next morning Petitioner awoke with pain in his chest.  He cried and his fingers were curled together.  Velasquez believed Petitioner may have been having a heart attack and asked Salvador to call Alejandra.  (RT 477-478, 664-665, 753.)

When Alejandra arrived Petitioner appeared better.  (RT 665.)  It looked like Velasquez had been crying, and Petitioner told Alejandra that if she had not answered the phone he would have killed Velasquez.  (RT 718.)  Petitioner asked Alejandra why she gave Velasquez something to put inside her, and Alejandra asked why he was accusing her of that.  (RT 479-480, 719.)  Petitioner wanted Alejandra to take Velasquez to the doctor to have the item removed.  He then pushed Velasquez and told her to come back the way she was before.  (RT 479-480, 665-667, 719.)

As Alejandra drove Velasquez told her what happened the previous night.  Velasquez attempted to get some medication to show Petitioner that she had put something inside her, but the assistant refused to do so.  (RT 481, 726.)  Alejandra drove Velasquez to a church where her children were attending summer school.  Petitioner was there talking with the pastor.  (RT 482-483, 726.)

Velasquez went home with Petitioner and their children.  The next morning, Petitioner told her they were going back to the clinic to have the thing removed from her vagina.  (RT 484-486, 670.)  Salvador drove them to the clinic, but he stayed inside the vehicle.  (RT 484-487, 735.)  Petitioner told the medical assistant at the front desk that he wanted a doctor or nurse to check Velasquez in front of him to remove the foreign object in her vagina.  (RT 803.)  Petitioner and Velasquez spoke with the medical assistant in a back room.  Petitioner said his wife was breathing heavily when she slept and something was making her masturbate.  (RT 809.)  She informed Petitioner that she could not perform the examination because she was only a medical assistant.  The assistant did not report the incident to the police because she did not believe violence was involved.  (RT 804, 806.)

1    Medical assistant, Anita Diaz, remembered Petitioner saying that he attempted to remove
2    the object out of Velasquez's vagina.  (RT 804.)  Diaz wrote a report regarding the incident but
3    did not mention Petitioner's statement.  She also provided a statement to the police a month or
4    two after the incident and spoke with the prosecutor.  She did not mention Petitioner's statement
5    to the police or the prosecutor.  (RT 806-808, 809-810.)

6    As Petitioner and Velasquez walked back to the car, Petitioner became angry and said
7    they knew what was inside her because one of them winked at her.  He continued to accuse her of
8    putting something inside her vagina and she repeatedly denied doing so.  (RT 489-490.)
9    Salvador observed that his father was angry and heard him accuse a medical worker of winking
10   at his mother and taking her side.

11   After returning home, Petitioner told Nayeli to pack his clothes because he was fed up
12   with them and he was going to Oregon.  (RT 491-492, 701.)  Nayeli did not see his mother or
13   brother pack clothes.  (RT 701-702.)

14   Petitioner later received a phone call regarding a missing paycheck. (RT 738.)  Petitioner
15   told Velasquez he wanted her to go with him to pick up the check.  (RT 491-492, 739.)
16   Petitioner told Salvador not to go with them, but Velasquez asked him to go.  When they left,
17   Petitioner was very angry and Velasquez was crying.  (RT 491-492, 609, 739.)

18   As they began driving, Velasquez noticed that Petitioner was taking a different freeway
19   than the one that lead to his employer's business to pick up the check.  Petitioner told Velasquez
20   he was taking them to Oregon and told her to tell the truth about what she had inside her.  (RT
21   613-614.)  During the drive, Petitioner called Nayeli and told her to go stay at another family's
22   home.  (RT 704-705.)

23   After driving for a few hours, Petitioner stopped at a gas station.  He told Salvador to go
24   and get some food.  When Salvador exited the car, Petitioner told Velasquez that he was going to
25   kill her when they arrived in Oregon.  (RT 614-615, 743.)  Velasquez decided to try to get help.
26   (RT 682-683.)

27   After Petitioner got out of the truck to look for Salvador, Velasquez exited the vehicle
28   and began screaming and crying for help.  Brian Gibbs, who was at the gas station, heard her

screaming and saw Petitioner attempt to grab her from behind.  Gibbs yelled for Petitioner to let her go.  Petitioner stopped pushing her but did not let go of her.  (RT 817-818.)

Gibbs was able to pull Velasquez away from Petitioner.  She told Gibbs that Petitioner was going to kill her, and he took her into the store at the gas station.  (RT 615-616.)  Gibbs told his wife to call the police.  (RT 823.)  While waiting for the police, Petitioner repeatedly approached them saying Velasquez was his wife.

Petitioner and Salvador got back into the truck and just before they drove away the police arrived.  The police patted Petitioner down and interviewed him in the parking lot.  Velasquez spoke with the police and indicated she was a submissive wife who always did what Petitioner told her.  (RT 616-618.)  Velasquez's arm, wrist, and legs were bruised from Petitioner.  (RT 620-622.)

Defense

Christina Espiritu, an investigator from the Public Defender's Office, attempted to interview Velasquez and her children.  Velasquez told Espiritu that her attorney advised her not to speak with Espiritu.  Salvador initially agreed to speak with Espiritu, but Velasquez intercepted and did not allow Salvador or Nayeli to speak with her.  (RT 854-857.)

Deputy Martin Barron of the Kern County Sheriff's Department served a subpoena on Velasquez for Petitioner.  (RT 878-879.)  Velasquez asked Deputy Barron if she had to speak with Petitioner's counsel and Barron advised that she did not.  (RT 880.)  Deputy Barron then told Petitioner's counsel over the telephone that Velasquez did not wish to speak with him.  (RT 879-882.)

Adam Garza, of the Fowler City Police Department, interviewed Velasquez twice on July 1, 2006.  Garza did not speak Spanish and had the gas station store clerk interpret for him.  During the second interview officer Marco Solian interpreted in Spanish.  (RT 885-887, 889, 892-893.)  Velasquez told Garza that Petitioner saw her masturbate during the night and claimed to have seen her put something in her vagina.  He accused her of doing so to prevent her from having children with him.  (RT 895-897.)  Petitioner became angry at the gas station and threatened to kill her.  (RT 897-899.)

1   Enrique Bravo, a Kern County deputy sheriff, interviewed Velasquez later that day at the

2   Wasco substation.  (RT 903-904.)  She told him she did not object to going to Oregon because in

3   her culture the wife was instructed to be submissive.  She sought help at the gas station because

4   she truly feared Petitioner would kill her.  (RT 905-906.)  Velasquez also described the details of

5   the incident that took place on June 20, 2006.  (RT 907-912.)

6                                              DISCUSSION

7   I.   Jurisdiction

8        Relief by way of a petition for writ of habeas corpus extends to a person in custody

9   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

10  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

11  529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

12  violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

13  out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28

14  U.S.C. § 2254(a); 2241(d).

15       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

16  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

17  enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

18  F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

19  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

20  1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

21  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

22  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

23  II.   Standard of Review

24       Where a petitioner files his federal habeas petition after the effective date of the Anti-

25  Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

26  the state court's adjudication of his claim:

27       (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the Supreme
28       Court of the United States; or

                                                    7

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

///

1    III.    Batson Claim

2        Petitioner claims the trial court erred in not finding that the prosecutor's stated reasons for

3    excusing three Hispanic jurors were pretexts for discrimination.  Because the California Supreme

4    Court's opinion is summary in nature this Court "looks through" that decision and presumes it

5    adopted the reasoning of the California Court of Appeal, the last state court to have issued a

6    reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115

7    L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher

8    court agrees with lower court's reasoning where former affirms latter without discussion); see

9    also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to

10   last reasoned state court opinion in determining whether state court's rejection of petitioner's

11   claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

12       A.    Last Reasoned Decision of California Court of Appeal

13   The Court of Appeal set forth the procedural history of this claim:

14           On voir dire, the first Hispanic prospective juror at issue, No. 882647,
     stated that he worked as an equipment operator for a farming company and that
15   his wife worked for a rose-growing company on a part-time basis. He had served
     on a criminal jury in a grand-theft case in which the jury reached a verdict. He
16   thought nothing in that case affected his ability to be fair and impartial. He had no
     close friends or relatives in law enforcement and did not know Garcia, either
17   lawyer, any potential witness, any private criminal defense attorney, anyone in the
     district attorney's office, or anyone in the public defender's office.

18
             Asked if anything about the case or the charges would affect his ability to
19   be fair and impartial, if crimes similar to the ones charged had affected his life or
     the life of anyone close to him, if he had ever had an unpleasant experience with
20   law enforcement, and if he or a close friend or relative had ever been charged with
     or victimized by a crime, No. 882647 answered in the negative. He could think of
21   no reason why he could not give both sides a fair trial. The prosecutor asked no
     questions of him.

22
             The second Hispanic prospective juror at issue, No. 954911, stated that
23   she worked as an office service supervisor, and that her husband worked as an
     industrial supervisor of maintenance and repair, for the Department of Corrections
24   and Rehabilitation. Neither she nor her husband was a sworn peace officer. She
     had never served on a jury before. Six members of her family worked for the same
25   state agency, and a former brother-in-law worked as chief of police in another
     county, but she thought none of those contacts would compromise her objectivity
26   or fairness. She did not know Garcia, either lawyer, or any potential witness.

27           Asked if anything about the case or the charges would affect her ability to
     be fair and impartial, if crimes similar to the ones charged had affected her life or
28   the life of anyone close to her, if she had ever had an unpleasant experience with

law enforcement, and if she or a close friend or relative had ever been charged with a crime, No. 954911 answered in the negative. Asked if she or a close friend or relative had ever been victimized by a crime, she replied that no one but she had. Her vehicle had been stolen and found burnt two days later. She thought her ability to be fair and impartial would not be affected by that and could think of no reason why she could not give both sides a fair trial.

Asked if the burden of proof should be higher in a case charging a sex crime against a spouse with whom he or she had had sexual activity before, No. 954911 replied in the negative. Asked if she could put aside consideration of "the five P's, pity, passion, prejudice, penalty, or punishment," she replied in the affirmative. Asked if the prosecutor should be held to the burden of proof of all the elements of every count and if at the end of trial "we can look at you and know that you're going to be fair," she and other prospective jurors collectively replied in the affirmative. Asked individually if the charges were damaging and if she could put aside sexual language she might hear and just weigh the evidence, she replied in the affirmative. Asked individually if sexual language might bother her or induce her to think Garcia was guilty, she replied in the negative.

The third Hispanic prospective juror at issue, No. 1046149, stated that he worked as a rig supervisor, that he was divorced, and that his former wife, with whom he kept in contact, was still depressed at having been molested at a young age. Asked if he could put that aside and judge the case solely on the evidence and the law, he replied in the affirmative. Asked if anything about the case or the charges would affect his ability to be fair and impartial, if he was going to hold his former wife's experience against Garcia, or if crimes similar to the ones charged otherwise had affected his life or the life of anyone close to him, he replied in the negative.

Asked if he or anyone close to him had ever had an unpleasant experience with law enforcement, No. 1046149 replied that he had not, but that his brother had, after his wife stabbed him. He not only witnessed the stabbing but also "separated them" to keep them "from going any further." Asked if that would compromise his ability to be fair and impartial or affect his perception of Garcia's case, he replied in the negative. Asked if he or a close friend or relative had ever been charged with a crime, he replied that a different brother had been charged with credit card fraud. Asked if he felt law enforcement, the prosecution, and the courts had treated his brother fairly, he replied in the affirmative. He acknowledged he could not "stay still in a seat very long" due to back surgery. The court assured him that if he needed to stand or move around he could do that "at any time."

No. 1046149 said that he had close friends and relatives who worked as correctional and detention officers and that his association with those people would not compromise his ability to be fair and impartial. He had no prior jury service and no familiarity with Garcia, either lawyer, any potential witness, any private criminal defense attorney, anyone in the district attorney's office, or anyone in the public defender's office. He said he could think of no reason why he could not give both sides a fair trial.

After the prosecutor exercised a peremptory challenge (her third) to No. 954911, a peremptory challenge (her sixth) to No. 1046149, and a peremptory challenge (her ninth) to No. 882647, Garcia made a *Batson-Wheeler* motion. "Looking at the profile of the jury panel," his attorney argued, "there have been very few Hispanic jurors there." With reference to No. 954911, he stated, "There wasn't anything about her answers, other than her nationality, that would cause her

10

to be excluded as a juror." As to No. 1046149, he commented, "If anything, the answers that he gave [about his former wife's history as a child abuse victim and about his brother's history as a stabbing victim] would normally go to the benefit of the prosecution." With reference to No. 882647, he noted that the prosecutor "didn't even ask him any questions because he really answered all questions appropriately, unbiased, and he stated that that was the case." Characterizing the prosecutor's exercise of peremptory challenges as "systematically excluding, knocking off Hispanic jurors, when we have no Hispanic jurors now in the jury box," he requested a mistrial.

The court asked the prosecutor to articulate "factors involving the background" of each of the three Hispanic prospective jurors. As to No. 954911, the prosecutor stated, "I'm picking a panel of good people that I believe will get along. I was watching her body language and demeanor throughout the entire time," on the basis of which she concluded she "was not comfortable" with No. 954911. With reference to No. 1046149, the prosecutor noted "first of all" that he was a divorced male, after which she expressed "tremendous concern" that one of his brothers was stabbed by his wife and that another of his brothers was charged with credit card fraud. Even though the court noted he could "stand up and so on and so forth" to accommodate his back problem, she opined that, "taking all of that together," she saw no need "to inconvenience him" since there were "enough issues" to give her pause.

Without waiting for comments, if any, from the prosecutor about No. 882647, the court found "that from the totality of the facts that there's a showing that's been made that gives rise to an inference of discriminatory purpose." The court noted that the burden had shifted to the prosecutor and asked her "to explain adequately the offering, if there are, of race-neutral justifications" for the dismissals of each of the three Hispanic prospective jurors.

In response, the prosecutor noted that No. 1046149's marital status as a divorced male "in combination with some other things" gave her "a little bit of an alarm." He had witnessed his brother's wife stabbing him, but in a courtroom full of people she was "not going to start asking questions whether or not he thinks women in domestic violence cases are potentially all looney and crazy." Those factors, together with his back problem and his other brother's conviction of a crime, led her to feel he was not "an appropriate juror to sit in this particular case."

With reference to No. 954911, on the basis of "her body language, attitude, and demeanor towards other female jurors" during jury selection, the prosecutor formed the "personal impression" that she was "uninvolved and unconcerned" and that she "didn't particularly care to participate." Elaborating, she said, "I'm a female prosecutor, I have a female victim, and I have female jurors on this case, and it's been my experience as a prosecutor that picking a group that can be cohesive and get along is incredibly important."

As to No. 882647, the prosecutor gave "the occupational status of both him and his wife" as her "reason for excluding him." She thought he might have "some allegiance to the defendant or to the victim in a way that could be inappropriate on either side, both based on his wife's experiences in their occupations, as well as his experiences in his occupation." She "didn't think that he'd be a good mesh" with the other prospective jurors and "didn't want to take that there were any sort of issues in their occupations that could influence him one way or another."

///

The court asked Garcia's attorney if he had "anything to add by way of showing that there's been a purposeful racial discrimination and exclusion." Replying in the affirmative, he asked the court "to look at the cross-sectional makeup of the jurors" to find that "there aren't very many Hispanics and all of the ones that were in the panel are all gone." He characterized the prosecutor's "cohesiveness" rationale as a "prejudicial" and "selective" way "to eliminate the Hispanics." At that juncture, the court found that the prosecutor offered "race-neutral explanations" and that the defense made "no showing, to [the court's] satisfaction, that the exclusions were for purposeful racial discrimination" and, on that basis, denied Garcia's motion.

In finding the claim to be without merit, the appellate court reasoned as follows:

The record shows implementation by the court of the established three-step Batson/Wheeler procedure for determining whether the prosecutor's use of peremptory challenges was constitutionally permissible. First, Garcia had – and, the court found, discharged – the burden of making out a prima facie case "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (*Johnson [v. California]*, 545 U.S. 162, 168 (2005)].) Second, the prosecutor had – and, the court found, discharged – the duty "'to explain adequately the racial exclusion'" by offering permissible race-neutral justifications for the peremptory challenges at issue. (*Ibid.*) Third, the court had – and, the record shows, discharged – the duty to decide if the opponent of the peremptory challenges at issue "'proved purposeful racial discrimination.'" (*Ibid.*)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Garcia proffers comparative juror analysis as to two prospective jurors seated on the panel. As to the first, he argues that non-Hispanic No. 1048200's father was convicted of grand theft 25 years ago, but the record shows that he was charged, not that he was convicted. Garcia notes that No. 1048200, like No. 1046149, believed "the case had been handled fairly" and "would not affect heir ability to be fair in this case," but No. 1048200's father was a charged perpetrator, not a victim like No. 1046149's former wife. No. 1046149 had other complications – one brother was stabbed by his wife, another brother was charged with credit card fraud, and the sequelae of back surgery left him incapable of sitting still for long – that made him problematic to a degree No. 1048200 was not. As to the second prospective juror seated on the panel, Garcia notes that non-Hispanic No. 1004857's brother-in-law was convicted of selling drugs a year ago. Like No. 1048200, however, No. 1004857 did not manifest multiple troubling factors as did No. 1046149, for example.

The record shows substantial evidence of the subjective genuineness of the prosecutor's race-neutral reasons (*Reynoso*, supra, 31 Cal.4th at p. 924) and of the grounding of her rationale in accepted trial strategy (*Miller-El v. Cockrell*, supra, 537 U.S. at p.339). Abundant evidence supports the court's finding that the prosecutor's explanations for exercising peremptory challenges to No. 882647, No. 954911, and No. 1046149 alike were credibly race-neutral. Due to the trial court's unique position from which to assess prospective jurors' demeanor, "'a factor of critical importance in assessing the attitude and qualifications of potential jurors,'" deference by the reviewing court to the trial court is appropriate. (*Lewis*, supra, 43 Cal.4th at p. 483, quoting *Uttecht v. Brown* (2007) __ U.S. __, __ [127 S.Ct. 2218, 2224; 167 L.Ed.2d 1014, 1022].) Under the

1  deferential substantial evidence standard, Garcia fails to show an entitlement to
   relief.
2  (Lodged Doc. No. 7, at 8-10.)

3       The Court has reviewed the record, including the transcript of the voir dire process and

4  comparative analysis by the state appellate court, and the state court's disposition of this claim

5  was not contrary to or an unreasonable application of clearly established federal law.  Nor was

6  the decision based on an unreasonable determination of the facts in light of the evidence

7  presented.  The trial court found the prosecutor's race-neutral explanations were credible, and the

8  appellate court properly deferred to this determination.  <u>Rice</u>, 126 S.Ct. 974.  The trial court

9  inquired into the reasons for challenging the three prospective Hispanic jurors and The

10 prosecutor expressed neutral bases for the use of the peremptory challenges of jurors nos.

11 1046149, 954911, and 882647.  Although Petitioner claims that other comparable non-Hispanic

12 jurors were not excused, for the reasons explained by the appellate court those jurors were not

13 similarly situated.  Based on the totality of the circumstances the trial court reasonably found

14 purposeful racial discrimination had not been proven, and the state court's rejection of this claim

15 with neither contrary to or an unreasonable application of controlling federal law; nor was it an

16 unreasonable determination of the facts in light of the evidence.

17 IV.    <u>Ineffective Assistance of Counsel</u>

18      Petitioner claims that his counsel was ineffective for failing to object to the testimony by

19 witness, Anita Diaz.  Petitioner raised this claim in habeas corpus petitions to the Kern County

20 Superior Court, Court of Appeal, and California Supreme Court.  The Kern County Superior

21 Court issued the last reasoned decision denying the claim stating:

22          Petitioner's statement to Anita Diaz is an admission falling within the
        hearsay exception of admission of a party opponent.  Cal. Ev[id]. Code Section
23      1220(a).  Ms. Diaz was relating the concepts of a report and petitioner's
        statements made therein during which he was attempting to obtain a medical
24      examination of his wife.  Failure to object on the basis of the prejudice
        outweighing probative value is generally deemed ineffective assistance of counsel.
25      [citation].  However, under the facts of petitioner's case, even if his counsel
        objected it is highly probable that the court would have overruled the objection as
26      the evidence was clearly relevant and the probative value outweighed the
        prejudicial effect.  Cal. Ev[id]. Code Section 352.
27
   (Lodged Doc. 11 at 3.)
28

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

///

14

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).  <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (2000).

Because the testimony by Diaz that Petitioner placed his hand in his wife's vagina was relevant and admissible under California law, there was simply no basis for counsel to object.  As a consequence, there was no prejudice by counsel's failure to object.  Furthermore, the evidence of Petitioner's guilt was powerful.  Petitioner's wife testified that he penetrated her vagina multiple times.  A family friend also confirmed that Petitioner's wife told her penetration occurred.  Thus, even had counsel objected to the testimony, there is not a reasonable probability the result of the proceedings would have been different.  Therefore, Petitioner's claim fails under <u>Strickland</u>.

V.   <u>Insufficient Evidence to Support Conviction of Rape by a Foreign Object</u>

Petitioner contends that the evidence was not sufficient to prove penetration on the rape by foreign object charge.  Petitioner presented this claim on direct appeal, and the California Court of Appeal denied the claim in the last reasoned decision.

In denying the claim, the Court of Appeal held as follows:

> The record shows that Garcia's wife testified he opened her vagina with his fingers "from the most inner part that he could."  The court and counsel characterized her use of her hands at the witness stand as a "movement with the hands inward to outward" with a "spreading motion."  After testifying, "Inside is, well, um, within," and "on the outside, it's on the exterior," she testified that "he would open up my parts, my vagina, and he would look for something inside with using his fingers as if he were looking for something."  She testified, "My labia, he would spread it apart," and, "I felt that since he had me spreading my legs, I felt that he was looking, that he was moving his fingers."  In reply to the court's question, "Where?," she testified, "In my vagina."  Congruently, a member of the church Garcia and his wife attended testified that his wife told her Garcia put his fingers inside her vagina.

> Our duty on a challenge to the sufficiency of the evidence – both circumstantial and direct – is to review the whole record in the light most favorable to the judgment for substantial evidence – evidence that is reasonable, credible, and of solid value – that could have enabled any rational trier of fact to have found the defendant guilty beyond a reasonable doubt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318; *People v. Prince* (2007) 40 Cal.4th 1179, 1251 (Prince).)  In the discharge of that duty, we presume in support of the judgment the existence of every fact a reasonable trier of fact could reasonably deduce from the evidence.  (*Prince, supra,* at p. 1251.)  Garcia's insufficiency of the evidence argument is but a request that we reweigh the facts.  That we cannot do.  (*People*

*v. Bolin* (1998) 18 Cal.4th 297, 331-333.)

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

Under California law "'[s]exual penetration' is the act of causing the penetration,
however
slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." Cal. Penal Code § 289(k)(1).

The testimony of penetration came from three different witnesses.  Petitioner's wife testified unequivocally that Petitioner penetrated her with his fingers.  (RT 463-464, 466-467.)  A family friend corroborated the victim's testimony indicating she told her Petitioner placed his fingers in her vagina.  (RT 723-724.)  In addition, a medical worker testified that Petitioner told her he put his hand in his wife's vagina to try to take something out.  (RT 804.)  This was sufficient evidence for the jury to find that Petitioner penetrated his wife's vagina.  Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The instant petition for writ of habeas corpus is DENIED;

2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and

3.      The court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c);

        Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where

the applicant has made "a substantial showing of the denial of a constitutional

right," i.e., when "reasonable jurists would find the district court's assessment of

the constitutional claims debatable or wrong"; <u>Hoffman v. Arave</u>, 455 F.3d 926,

943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable

jurists would not find it debatable that the state courts' decision denying

Petitioner's petition for writ of habeas corpus were not "objectively

unreasonable."

IT IS SO ORDERED.

**Dated:**   **December 13, 2010**                    **/s/ Dennis L. Beck**
                                             UNITED STATES MAGISTRATE JUDGE